IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 9, 2024

**HORATIO LEWIS RICE v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Bedford County**
No. 19362-PC      Forest A. Durard, Jr., Judge

_____

**No. M2023-00609-CCA-R3-PC**

_____

Petitioner, Horatio Lewis Rice, appeals the denial of his post-conviction petition, arguing that the post-conviction court erred in denying his claims that trial counsel was ineffective by failing to adequately investigate Petitioner's mental health issues and that Petitioner lacked the mental capacity to enter into a constitutionally valid plea agreement. Following our review of the entire record and the briefs of the parties, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and MATTHEW J. WILSON, J., joined.

W. Alan Rose, Tullahoma, Tennessee, for the appellant, Horatio Lewis Rice.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Robert Carter, District Attorney General; and Michael D. Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

On December 13, 2021, Petitioner was indicted by the Bedford County Grand Jury for first degree murder (count one), attempted first degree murder (count two), possession of a firearm during the commission of a dangerous felony (count three), and possession of a weapon after having been convicted of a felony (count four). On April 18, 2022, Petitioner pled guilty to counts one, two, and three; count four was dismissed. Pursuant to the plea agreement, the trial court sentenced Petitioner to life without the possibility of

parole for count one, forty years as a Range II offender for count two, and ten years at 100% for count three, all to be served consecutively.

On August 11, 2022, Petitioner filed a pro se petition for post-conviction relief alleging general ineffective assistance of counsel. Following the post-conviction court's order requiring Petitioner to file a more specific statement for post-conviction relief, Petitioner filed an amended pro se petition. The post-conviction court appointed counsel to represent Petitioner, and following an evidentiary hearing on February 23, 2022, the post-conviction court entered a written order denying relief. Petitioner filed a timely notice of appeal.

*Plea Hearing*

The facts of this case, as set forth by the State at Petitioner's guilty plea hearing, are as follows:

> If this matter went to trial the proof would show that on September 13th, 2021 at approximately 9:16 p.m. Bedford County 911 received a call of a homicide at Duck River Laundry, that is located at 1201 North Main Street in Shelbyville. The caller stated that a male subject had been shot and he described the suspect as a black male with dreadlocks who had run from the scene.
>
> Shelbyville Police Department officers responded and the Criminal Investigation Division began their investigation there. On arrival at the scene there was observed a black Nissan Altima and this was in the parking lot there. The victim was identified as 14 year old Isreal Diago Pasqual. He was in the passenger seat of the vehicle.
>
> The victim's brother was also in the vehicle and he was able to give information to officers as they started their investigation. As part of the trial there would be information that was gained from search warrants, also video surveillance and of course also the autopsy of the young victim.
>
> In this investigation [Petitioner] and Tiffany Taylor were identified as suspects. Ms. Taylor gave a statement. [Petitioner] was actually located in Mississippi and eventually when [Petitioner] was taken into custody he did confess to shooting at this black vehicle.

At the plea hearing, the State advised the trial court that Petitioner was eligible for enhanced punishment on the first degree murder charge, including life without parole and the death penalty. In return for Petitioner's plea, the State had agreed not to file a notice to seek the death penalty so that Petitioner would live the rest of his life in the custody of the Tennessee Department of Correction ("TDOC"). The trial court questioned Petitioner extensively about Petitioner's proposed plea agreement:

THE COURT: Are you having any health problems today or on any drugs, alcohol or other medications that would affect your ability to understand my questions and answer me truthfully?

[Petitioner]: No, sir.

***

THE COURT: How far did you go in school?

[Petitioner]: I went to the 9th.

THE COURT: Can you read and write?

[Petitioner]: Yes, sir, I can.

THE COURT: So [Petitioner], before me I have a petition to enter a plea of guilty in your case. On the reverse side of that document there is a signature . . . is that your signature?

[Petitioner]: Yes, it is.

THE COURT: Did you read this document before you signed it?

[Petitioner]: Yes, sir, I read it.

THE COURT: Did you understand what you read?

[Petitioner]: Yes, sir. I understood what I read.

THE COURT: If you had any questions about anything that was on the document was [trial counsel] able to answer those questions to your satisfaction?

[Petitioner]: Yes, sir.

THE COURT: Do you have any questions about anything that is on there right now?

[Petitioner]: No, sir.

***

THE COURT: Have you discussed with [trial counsel] the various ways to handle the case meaning do I take it to trial, do I enter a plea and those type of issues?

[Petitioner]: Yes, sir, we talked about that.

THE COURT: So it has been represented to me you would enter a plea to [c]ount [o]ne taking life without the possibility of parole. In other words there is not – you will never be eligible for release; do you understand that?

[Petitioner]: Yes, I understand that.

***

THE COURT: All sentences are consecutive to one another, but consecutive to any other sentence currently in effect.

Is that your understanding of the agreement reached with the State, [Petitioner]?

[Petitioner]: Yes, sir, it is.

THE COURT: Now did this agreement come about as a result of your attorney negotiating on your behalf and you approving this particular resolution of the case?

[Petitioner]: Yes, sir, it was.

During the plea colloquy, the trial court reviewed Petitioner's charges, the elements of each offense, the penalties for each offense, and the rights Petitioner agreed to waive by entering the plea agreement. Petitioner acknowledged he was entering the guilty plea voluntarily, had no problems talking to trial counsel, and had no complaints about the way the case had been handled. Petitioner's only question was whether "everything is effective

- 4 -

today where I can go ahead up the road to prison[?]" The trial court found that Petitioner was entering the guilty pleas freely and voluntarily, knowingly, and intelligently, and accepted his pleas and sentenced Petitioner pursuant to the agreement.

*Post-Conviction Hearing*

At the post-conviction hearing, Petitioner testified that he was taking Prazosin, Paxil, and Benadryl, which had been prescribed to him for anxiety, blood pressure, and depression, and that he was on those medications the day he pled guilty. He complained that trial counsel was ineffective because he "show[ed] no signs of trying to help me . . . [p]rove a defense, a strategy, talk to me, or anything." He stated that because he was not "mentally right," he accepted the plea agreement under "false circumstances" thinking that trial counsel was not going to help him. Petitioner also complained that he was limited in time on conversations with trial counsel and felt that he was "eliminated" from the process of discussing his case. He was told repeatedly that if the case went to trial, "they were going to give [me] the death penalty."

Petitioner acknowledged that trial counsel discussed the first degree murder statute with him, reviewed the video of the shooting with him, and gave him a memorandum outlining his charges and sentence ranges. He was presented with the negotiated plea "a couple of weeks prior to court" but did not understand the sentences were consecutive until after he had entered the pleas. Had he known the sentences were consecutive, he would not have pled guilty. If he "had the chance to go to trial . . . [he] would have had an attorney fight and ask for lesser included offenses." Petitioner testified that he wanted that chance to go to trial and fight the charges.

On cross-examination, Petitioner acknowledged that trial counsel had been appointed to represent him in general sessions court at the preliminary hearing and had been his attorney all the way through the day he entered the guilty pleas. He agreed that when he was interviewed by police in Mississippi, he did not tell them he was experiencing any psychiatric issues. According to Petitioner, he did not need to tell them because that information was in his "medical files when he got out of prison." Additionally, he had overdosed prior to the shooting and that was also in his records, so Petitioner thought the police already had his medical information.

Petitioner agreed that trial counsel showed him the video which recorded Petitioner's pulling the trigger, shooting and killing a fourteen-year-old boy. Trial counsel also showed Petitioner the video of his recorded confession to the police where he agreed that he was the person who committed the shooting. Petitioner agreed that trial counsel reviewed with him his 2007 conviction for attempted second degree murder and his 1998 conviction for aggravated assault. He denied that trial counsel made him aware that those

convictions could be used as aggravating factors by a jury to impose the death penalty; however, trial counsel did make him aware that if the case went to trial, the State was going to seek the death penalty.

Petitioner maintained that he did not understand that his sentences would be served consecutively, and added that he did not know what the word consecutive meant until he looked it up after he had entered his guilty pleas. He did acknowledge that the consecutive sentences were somewhat inconsequential because they were consecutive to his life without parole sentence. Petitioner alleged that he did not read the plea petition before he signed it and that he answered the trial court's questions affirmatively because he "wanted to get it over." He agreed that he lied to the judge when answering the questions during the plea colloquy.

The post-conviction court asked Petitioner about the trial court's questions and Petitioner's answers during the plea colloquy. Petitioner maintained he was not able to grasp any of the questions and that he was "too emotionally overwhelmed" to understand what he was signing.

Trial counsel had been a criminal defense attorney since 1981, was capital case qualified, and had been both lead counsel and co-counsel on capital cases in the past. He had been appointed to represent Petitioner at the beginning of the criminal prosecution and represented him until the time he pled guilty. Trial counsel testified that he met with Petitioner multiple times and explained to him the elements of every crime he was charged with as well as all lesser included offenses. He disclosed to Petitioner the discovery provided by the State and discussed the significance of the evidence. His standard practice at the time was to prepare a memorandum outlining all charges and sentence ranges, and he typically referenced that memorandum at the conclusion of a plea acceptance. It was also his practice to have his clients sign duplicate copies of the plea petition and have the client initial each sentence of the plea form when pleading guilty; however, he noted that the copy of the plea petition in Petitioner's court file did not have Petitioner's initials after each sentence. He believed Petitioner's copy of the plea petition would have been initialed.

Trial counsel testified that in this case, there was critical evidence against Petitioner, specifically, the audiotape from Petitioner's interview in Mississippi and various videos showing the crime scene from different angles. One video clearly showed Petitioner standing or running down a building "with his hand outstretched with the gun going off"; another showed Petitioner exiting his vehicle and going toward the side of the vehicle as he shot; another captured the car as it was being shot and specifically showed bullets hitting the vehicle and people in the vehicle. Trial counsel thought that evidence was more than sufficient to establish Petitioner's identity as the shooter. Additionally, the State had Petitioner's recorded confession from his interview in Mississippi.

Trial counsel told Petitioner his prior convictions qualified as aggravating factors in seeking the death penalty; that information was also outlined in the memorandum he provided to Petitioner. The District Attorney General's office had advised trial counsel not to wait for an offer from them; they were waiting on an offer from Petitioner or if they received no offer, there would be an enhancement notice likely to seek the death penalty. Trial counsel relayed that information to Petitioner and had an "extensive conversation" about what a jury would likely do with his past record and the death of a fourteen-year-old boy. Ultimately, the District Attorney General's office advised they would accept life without the possibility of parole and that they wanted separate sentences for the other passenger in the vehicle who was in the line of fire.

Prior to the date Petitioner entered his guilty pleas, trial counsel discussed the offer with Petitioner, and Petitioner told trial counsel he was willing to accept the offer. Trial counsel testified that he had checked the jail logs, and "from April 11th through April 14th or 15th or 16th, I was down there every other day anywhere from one to three hours." There was "no question" in trial counsel's mind that Petitioner was fully informed and did not want to "roll the dice or gamble." They discussed the consecutive sentencing aspect of the plea deal. In "old school" language, consecutive sentences were referred to as "running wild." Trial counsel specifically told Petitioner the sentencing agreement was "running wild," and he believed Petitioner fully understood what that meant. Trial counsel also told Petitioner that if Petitioner agreed to the plea deal, he would die in TDOC custody. He said, "one of two things are going to happen. You are going to die in TDOC custody. In one case, nature will take care of it. In the other event, the state will pick the date, the time, the place, and the manner or method. He understood that." According to trial counsel, Petitioner did not want the death penalty.

Trial counsel reviewed the plea petition with Petitioner one or two days before the actual plea was entered. Petitioner had some questions which trial counsel answered. The plea agreement was signed in the courtroom. To trial counsel's knowledge, Petitioner did not appear to be under the influence of any prescription drugs. Trial counsel did not believe Petitioner was receiving any medication in the jail. He was aware of Petitioner's overdose a few months before the shooting and knew Petitioner had been revived with two cans of Narcan. Trial counsel had examined Petitioner's TDOC records and the Marshall County records on Petitioner's attempted murder conviction and saw no indication of any mental health problems. Had trial counsel thought Petitioner had any mental issues, he would have "petition[ed] the Court."

Petitioner told trial counsel the death of the victim was a mistake, and he "didn't mean to hurt that boy." Trial counsel explained that under the theory of transferred intent,

the fact that Petitioner did not know the victim did not excuse his actions and that he did not believe Petitioner would get any sympathy from the jury.

On cross-examination, trial counsel agreed that he never petitioned the court for a mental health evaluation for Petitioner. He was aware that Petitioner had picked up some vandalism charges when he was first brought into the jail and that he had been placed in solitary confinement. He was aware of a report that Petitioner had banged his head into a metal sink, but the incident had been reported as vandalism, not an effort by Petitioner to harm himself. Nothing about Petitioner's behavior during trial counsel's visits with him "alarmed [trial counsel] that [he] might need to seek a mental evaluation or some type of medical intervention or diagnosis." Trial counsel was aware Petitioner had not graduated from high school, but Petitioner said he could read and write, and trial counsel was confident Petitioner comprehended the material he covered with him.

Following the hearing, the post-conviction court found that Petitioner's claims regarding ineffective assistance of counsel had no merit. The post-conviction court also found that Petitioner's post-conviction testimony was not credible and that "[t]here was no ignorance, mistake or misunderstanding by []Petitioner in taking the plea and trial counsel was in no way deficient in any manner and, thus the prejudice prong is not even reached." It is from this denial, that Petitioner now appeals.

**Analysis**

On appeal, Petitioner claims that the post-conviction court erred in denying his petition for relief based on the ineffective assistance of counsel because trial counsel had knowledge of Petitioner's "mental health deterioration" and failed to petition the court for a mental health evaluation. The State responds that the post-conviction court properly denied relief when it determined that Petitioner failed to prove that trial counsel's decision not to seek a mental health evaluation was deficient or that it prejudiced Petitioner. We agree with the State.

Under the Post-Conviction Procedure Act, a criminal defendant may seek relief from a conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. Because the right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee, the denial of effective assistance of counsel is a constitutional claim cognizable under the Post-Conviction Procedure Act. *See* U.S. CONST. amend. VI; TENN. CONST. art. I, § 9; *Howard v. State*, 604 S.W.3d 53, 57 (Tenn. 2020).

"Appellate review of an ineffective assistance of counsel claim is a mixed question of law and fact" that this Court reviews "de novo." *Phillips v. State*, 647 S.W.3d 389, 400 (Tenn. 2022) (citing *Dellinger v. State*, 279 S.W.3d 282, 294 (Tenn. 2009)). As an appellate court, we are bound by the factual findings of the post-conviction court unless the evidence in the record preponderates against those findings. *Howard*, 604 S.W.3d at 57 (citing Tenn. R. App. P. 13(d)); *see also Arroyo v. State*, 434 S.W.3d 555, 559 (Tenn. 2014); *Fields v. State*, 40 S.W.3d 450, 456, n.4 (Tenn. 2001). The same does not hold true for the post-conviction court's conclusions of law which are reviewed de novo with no presumption of correctness. *Howard*, 604 S.W.3d at 57; *Holland v. State*, 610 S.W.3d 450, 455 (Tenn. 2020).

When a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993); *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). Deficient performance is representation that falls below "an objective standard of reasonableness" as measured by prevailing professional norms. *Kendrick*, 454 S.W.3d at 457 (quoting *Strickland*, 466 U.S. at 688); *see also Baxter v. Rose*, 523 S.W.2d 930, 932-33 (Tenn. 1975). To show prejudice, a petitioner must demonstrate a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694; *Kendrick*, 454 S.W.3d at 458. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Reasonable probability is a lesser burden of proof than preponderance of the evidence. *Kendrick*, 454 S.W.3d at 458 (citing *Williams v. Taylor*, 529 U.S. 405-06 (2000)).

Failure to satisfy either prong results in the denial of relief. *Strickland*, 466 U.S. at 697; *Nesbit v. State*, 452 S.W.3d 779, 786-87 (Tenn. 2014). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). "[T]he petitioner is required to prove the *fact* of counsel's alleged error by clear and convincing evidence." *Phillips*, 647 S.W.3d at 401 (quoting *Dellinger*, 279 S.W.3d at 294 (emphasis in original)); *see also* T.C.A. § 40-30-110(f); Tenn. Sup. Ct. 28, § 8(D)(1).

When a Petitioner alleges deficient investigation by counsel, he must present evidence that proves what further investigations would have uncovered in order to establish prejudice. *See Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990); *see also Brookins v. State*, No. W2022-01214-CCA-R3-PC, 2023 WL 2017580, at *11 (Tenn. Crim. App. Feb. 15, 2023), *perm. app. denied* (June 7, 2023); *see also Allen v. State*, No. E2010-01971-CCA-R3-PC, 2012 WL 826522, at *5-6 (Tenn. Crim. App. Mar. 13, 2012).

In his brief, Petitioner argues that trial counsel had knowledge of Petitioner's prior overdose, substance abuse and dependence, and self-harm tendencies while incarcerated, and thus trial counsel should have requested a mental health evaluation for Petitioner. Tennessee Code Annotated section 33-7-301 provides that when a criminal defendant "is believed to be incompetent to stand trial, or there is a question about the defendant's mental capacity at the time of the commission of the crime," the defendant may undergo a mental health evaluation.

At the post-conviction hearing, trial counsel testified that he met with Petitioner on multiple occasions and that nothing about Petitioner's behavior during those visits "alarmed [trial counsel] that [he] might need to seek a mental evaluation of some type of medical intervention or diagnosis." While Petitioner had not graduated from high school, he told trial counsel he could read and write, and trial counsel was confident Petitioner comprehended the material he covered with him. Trial counsel had reviewed Petitioner's TDOC records and Marshall County records, and contrary to Petitioner's testimony, there was no evidence in Petitioner's records of any mental health concerns, nor was there any record that Petitioner was receiving any medication in the jail. Trial counsel was aware that Petitioner had previously overdosed, but based on his discussions with Petitioner, he believed Petitioner had a substance abuse problem, not a mental health problem. Trial counsel was also aware of Petitioner's vandalism charges while incarcerated. Contrary to Petitioner's assertion, trial counsel testified that nothing about Petitioner's behavior or interactions with trial counsel indicated a question about Petitioner's mental capacity or competency to stand trial.

"[T]o successfully bring a claim for ineffective assistance of counsel due to a failure to present [a] mental health defense, a petitioner must establish that he suffered from a mental disease or defect at the time of the commission of the underlying offense." *Owens v. State*, No. E2011-01190-CCA-R3-PC, 2012 WL 765205, at *9 (Tenn. Crim. App. Mar. 12, 2012). The only proof at the post-conviction hearing that Petitioner had any mental disease or defect was his self-reported anxiety and depression. He presented no testimony from a mental health expert nor any documentation from his medical records to indicate any mental health deficiency. *See Jackson v. State*, No. M2001-02005-CCA-R3-PC, 2002 WL 31757477, at *8 (concluding that when petitioner did not present mental health experts at the evidentiary hearing, he failed to provide evidence of trial counsel's deficient performance in not pursuing a mental health defense); *Johnson v. State*, No. W2011-02123-CCA-R3-PC, 2012 WL 772795, at *8 (Tenn. Crim. App. Feb. 27, 2013) (denying post-conviction relief because trial counsel was not deficient in relying on interactions with the petitioner to determine that no mental health evaluation was needed and the petitioner "failed to present the testimony of an expert at the evidentiary hearing to explain what, if any mental health evidence trial counsel show have advanced"); *Parks v. State*, No. E2014-02359-CCA-R3-PC, 2015 WL 9013165, at *5 (Tenn. Crim. App. Dec. 15, 2015) (denying

- 10 -

post-conviction relief in part because the petitioner failed to present "evidence at the post-conviction hearing of what a mental health evaluation would have revealed and how it would have affected the outcome of his case").

The post-conviction court accredited trial counsel's testimony and found Petitioner's testimony not credible. The evidence does not preponderate against the post-conviction court's findings that Petitioner failed to prove he received the ineffective assistance of counsel.

Petitioner also claims that he was unable to enter into a constitutionally valid plea agreement due to his lack of mental capacity. The State argues that Petitioner failed to prove his plea was constitutionally defective. We agree with the State.

To satisfy constitutional standards of due process, a guilty plea must be entered knowingly, intelligently, and voluntarily. *Boykin v. Alabama*, 395 U.S. 238, 243 (1969). When evaluating the knowing and voluntary nature of a guilty plea, "[t]he standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). In making this determination, the reviewing court must look to the totality of the circumstances. *See State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995); *Chamberlain v. State*, 815 S.W.2d 534, 542 (Tenn. Crim. App. 1990). This court may consider the following circumstantial factors:

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

*Blankenship v. State*, 858 S.W.2d 897, 905 (Tenn. 1993). "[A] plea is not 'voluntary' if it results from ignorance, misunderstanding, coercion, inducements, or threats." *Ward v. State*, 315 S.W.3d 461, 465 (Tenn. 2010) (quoting *State v. Mellon*, 118 S.W.3d 340, 345 (Tenn. 2003). A defendant's solemn declaration in open court that his plea is knowing and voluntary creates "a formidable barrier in any subsequent collateral proceeding" because these declarations "carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

Petitioner testified that he was taking Prazosin, Paxil, and Benadryl on the day he pled guilty, that he was not "mentally right," and that he accepted the plea agreement under

"false circumstances" that trial counsel was not going to help him. Petitioner's testimony at the post-conviction hearing was completely opposite to his statements at the plea colloquy. As summarized in the post-conviction court's order, Petitioner testified that he lied to the trial court when his plea was taken:

> [Petitioner] told the trial court he was not on any medications which would affect his ability to understand the questions and answer them truthfully. He told the post-conviction court just the opposite. He told the trial court that he had no problems talking with trial counsel. He told the post-conviction court just the opposite. He told the trial court his plea was knowing and voluntary. He told the post-conviction court just the opposite. He told the trial court he read the plea paperwork before he signed it. He told the post-conviction court just the opposite. He told the trial court he had no complaint about the way his case (referring to trial counsel) had been handled. He told the post-conviction court just the opposite. He told the trial court he understood what he read from the petition to enter a plea of guilty. He told the post-conviction court just the opposite, and so on and so on.

(footnotes omitted).

The post-conviction court also noted that Petitioner's statement that he wanted to go to trial hoping to get convicted of a lesser included offense even though he would run the risk of getting the death penalty was "an absurdity" given that there were three videos identifying Petitioner and the shooting, the fact that he fled to Mississippi, and his confession that he did the shooting, but shot at the wrong vehicle. The record supports the post-conviction court's finding that Petitioner's testimony had no credibility and that trial counsel's testimony was "fully credible." *See Blackledge*, 431 U.S. at 74 (holding that a petitioner must overcome the "strong presumption of verity" of declarations in open court to obtain collateral relief). A petitioner's representations under oath that his guilty plea is knowing and voluntary create "a formidable barrier in any subsequent collateral proceedings." *Id*. The evidence does not preponderate against the post-conviction court's findings that Petitioner knowingly and voluntarily entered his guilty pleas.

## CONCLUSION

For the forgoing reasons, the judgment of the post-conviction court is affirmed.

_____
JILL BARTEE AYERS, JUDGE

- 12 -